## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 14 2018, 9:24 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Andrew R. Falk
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jordan Allen-Wilson, *Appellant-Defendant,* | August 14, 2018 |
| | Court of Appeals Case No. 18A-CR-201 |
| v. | Appeal from the Hendricks Superior Court |
| State of Indiana, *Appellee-Plaintiff* | The Honorable Rhett M. Stuard, Judge |
| | Trial Court Cause No. 32D02-1608-F2-12 |

**Vaidik, Chief Judge.**

# Case Summary

[1] Jordan Allen-Wilson appeals his conviction for Level 2 felony robbery resulting in serious bodily injury, arguing that the State failed to rebut his mistake-of-fact defense. He also contends that, even if the State rebutted his defense, his sentence is inappropriate. We affirm.

# Facts and Procedural History

[2] In July 2016, Stephanie Hegwood and Sean Euliss were at a hotel together. At some point Sean left, leaving the keys to his truck in the hotel room. Sean was in the process of moving, and his truck was full of his personal belongings. Stephanie took Sean's keys, went to his truck, and stole everything out of it. After discovering that Stephanie had stolen his personal belongings, Sean told her that she was indebted to him and either had to return the property or find a way to give him the cash value of his items.

[3] One month later, Paul Shoemaker was celebrating his birthday at his home in Brownsburg by grilling steaks and drinking. He contacted Stephanie, who was a known prostitute, to come over and asked her to bring "party favors" (drugs). Tr. Vol. II p. 125. When Stephanie arrived at Paul's house, he was visibly drunk and "stumbling." *Id.* at 212. The pair sat down at the dining-room table and snorted lines of heroin that Stephanie had brought. Paul then stood up to check on his steaks, fell over, hit his head, and passed out. Stephanie then decided to rob Paul. Stephanie took Paul's work-laptop bag, ID, multiple cell

phones, license to carry a handgun, and work keys (Paul was an ATM technician and had keys to various bank branches and ATMs).

[4] As she went through Paul's house, Stephanie discovered that he had multiple long guns, including several AR-15s. She saw an opportunity to repay her debt to Sean and called him. Stephanie told Sean that she was at a client's house, that she had some money and stuff for him, and that this was her way of settling her debt. Eager to get repaid, Sean called Allen-Wilson and asked him to come to Paul's house. At the time, Allen-Wilson was at his apartment high on methamphetamine and heroin. He was accustomed to getting last-minute phone calls from Sean asking him to do odd jobs; the pair did landscaping, home repairs, auto repairs, and moved equipment together. Allen-Wilson agreed to help, Sean picked him up, and the pair headed off to Paul's house.

[5] When Sean and Allen-Wilson arrived at Paul's house, Stephanie was outside smoking a cigarette. She told Sean to park in the driveway by the back door and to come inside; Sean did as instructed. When he and Allen-Wilson walked into Paul's house, Stephanie was sitting at the dining-room table, and Paul was awake and sitting by the front door. Sean walked past Paul and directly to Stephanie to ask where the stuff she had for him was. Allen-Wilson, who stayed by the front door, recognized that Paul was high and said, "[M]an that must have been some good boy [(heroin)]." Tr. Vol. III p. 134. Paul, realizing that two men he didn't know were in his house, stood up and hurriedly walked to his roll-top desk in the dining room. Confused by Paul's actions, Sean looked over at the desk and saw a handgun laying on it. Sean grabbed the gun,

pointed it at Paul's head, and told Paul to lie on the floor. Paul complied, and Sean, who had handcuffs in his pocket, handcuffed Paul. Sean then instructed Allen-Wilson to grab a blanket, which was thrown over Paul's head.

[6] Stephanie then told Sean that she'd placed items for him by the back door. Sean told Allen-Wilson to start loading the truck with the stuff by the door. Allen-Wilson loaded the items by the door and items he found in Paul's basement, including ten guns (AR rifles, other long guns, and multiple handguns) and over 10,000 rounds of ammunition, into the truck. The guns were already placed in cases, and the ammunition was inside a tote bag. Meanwhile, Paul asked Sean if he could use the restroom, and in exchange he would give Sean the combination to his safe. Sean placed the barrel of the handgun to Paul's head and demanded the location and combination to the safe, which Paul gave. Sean and Stephanie took Paul's coin collection, stamp collection, and gold and silver bars, all of which were stored in the safe. Stephanie then left Paul's house. Before leaving, Sean grabbed a laptop-charging cord and wrapped it around Paul's neck and tied it to the handcuffs. Sean and Allen-Wilson then left the house and went to Allen-Wilson's apartment. Once there, they took the gun cases and tote bag inside to see what they had actually taken from Paul's house.

[7] After the trio left Paul's house, Paul was able to remove the blanket, get outside, and have a neighbor call 911. Paul gave his statement to police, including Stephanie's name. He was then taken to the hospital where he was treated for his injuries, including a head contusion and lacerations on his wrists

from the handcuffs. As a result of being handcuffed too tightly, Paul suffered permanent nerve damage in his hands, causing them to periodically go numb. He also has permanent marks on his wrists from the handcuffs.

[8] Meanwhile, the Brownsburg police were unclear if Stephanie was also a victim or part of the robbery, so they began pinging her cell phone for its location. They were able to locate her and placed her in custody. Stephanie admitted her involvement in the robbery and provided officers with Sean's name. She did not know Allen-Wilson's name, but she was able to identify him from a photo the police provided.

[9] Five days after the robbery, officers located Allen-Wilson and Sean and took them into custody. Officers searched Sean's truck and Allen-Wilson's apartment, finding multiple items belonging to Paul in both the truck and the apartment, including two of Paul's firearms. Detectives then interviewed Sean and Allen-Wilson separately. During Allen-Wilson's interview, a detective asked him to explain what happened. Allen-Wilson stated that Sean had called and asked him to help him pick up his stuff; Allen-Wilson said that he had no idea that a robbery was going to happen. Ex. 24, Video 3 at 14:19:40 (timestamp on video). A few minutes later, during the same interview, the detective asked, "At what point did you know that Stephanie and Sean were going to rob this guy?" *Id.* at 14:23:12. He responded, "When Sean was like 'Lay down!'" *Id.* at 14:23:18. Allen-Wilson was charged with Level 2 felony robbery resulting in serious bodily injury. The State also sought a sentencing enhancement pursuant to Indiana Code section 35-50-2-11, which allows for

the imposition of "an additional fixed term of imprisonment" on top of the base sentence for certain offenses (including Level 2 felony robbery resulting in serious bodily injury) if the defendant knowingly or intentionally used a firearm in the commission of the offense.

[10] While awaiting their trials, Allen-Wilson and Sean were housed in the same jail dorm. They agreed that Allen-Wilson would tell officers that he grabbed the gun, pointed it at Paul, placed the blanket over Paul, robbed Paul, and tied up Paul. Allen-Wilson agreed to take the blame because Paul's firearms were found in his apartment. Allen-Wilson then negotiated a plea deal with the State. But during his guilty-plea hearing, the State did not accept Allen-Wilson's version of events that Sean was not involved in the robbery and revoked the plea agreement. Allen-Wilson was then tried to the bench.

[11] At trial, Allen-Wilson raised a mistake-of-fact defense, arguing that he thought the property he took was Sean's. During its case-in-chief, the State played a video of Allen-Wilson's interview with detectives. Later in the trial, Allen-Wilson testified that he was the one who physically loaded all of the items from Paul's house into Sean's truck but that he thought it was all Sean's property. He stated, "I believed it and I was under the impression that it was Sean's stuff; nobody ever told me anything different. . . . I realized something funny was going on when Sean just randomly tied the dude up. I never knew that they were robbing the guy though." Tr. Vol. III pp. 141, 153. He added, "I never had a thought that we were taking somebody else's stuff. I didn't know it wasn't [Sean's] until I seen what the actual property was." *Id.* at 157. The

court found Allen-Wilson guilty of robbery but not guilty of the sentence enhancement.

[12] At sentencing, the trial court noted that Allen-Wilson had no criminal convictions, that his apartment might have been used to sell the stolen firearms, and that Allen-Wilson tried to "undermine the State's case." Tr. Vol. IV p. 63. The court stated that there were no "large mitigators or aggravators" but that it found "disturbing" that Allen-Wilson conspired with Sean to "subvert justice here but I – I don't think that's a huge, uh, I'm not going to find that as a huge aggravating factor." *Id.* Allen-Wilson was then sentenced to the minimum term of ten years, all executed. Because Allen-Wilson gave a false statement that Sean was not involved in the crime, the trial court also stated, "I don't think you've shown me that you are someone that's going to, uh, respond to probation very well." *Id.* at 65. The court concluded by recommending Allen-Wilson for Purposeful Incarceration and stated that upon successful completion of the program, the court would consider a sentence modification.

[13] Allen-Wilson now appeals.

# Discussion and Decision

[14] Allen-Wilson argues that the State did not present sufficient evidence to overcome his mistake-of-fact defense. He also contends that, even if the State rebutted his defense, his sentence is inappropriate.

# I. Mistake of Fact

In order to convict Allen-Wilson of robbery, the State was required to prove beyond a reasonable doubt that he knowingly or intentionally took property from Paul by using or threatening the use of force on Paul or by putting Paul in fear. Ind. Code § 35-42-5-1(a). The offense is a Level 2 felony if it "results in serious bodily injury to any person other than the defendant[.]"[1] *Id.* at (b). Allen-Wilson does not dispute that he took items from Paul's house. He contends, however, that he mistakenly thought the items belonged to Sean.

Pursuant to Indiana Code § 35-41-3-7, a mistake-of-fact defense "is a defense that the person who engaged in the prohibited conduct was reasonably mistaken about a matter of fact, if the mistake negates the culpability required for commission of the offense." After the State has made a prima facie case of guilt, the burden is on the defendant to establish an evidentiary predicate of his mistaken belief of fact. *Saunders v. State*, 848 N.E.2d 1117, 1121 (Ind. Ct. App. 2006), *trans. denied*. The State, however, retains the ultimate burden of disproving the defense beyond a reasonable doubt. *Id*.

At trial, Allen-Wilson claimed that he did not know that a robbery had taken place until Sean opened the gun cases and the tote bag at his apartment. His testimony, however, directly contradicted his interview with detectives five days after the robbery occurred. The State played a video of the interview, in which

---

[1] Effective July 1, 2017, robbery resulting in serious bodily injury is a Level 1 felony. I.C. § 35-42-5-1(b).

Allen-Wilson was asked, "At what point did you know that Stephanie and Sean were going to rob this guy?" Ex. 24, Video 3 at 14:23:12 (timestamp on video). He responded, "When Sean was like 'Lay down!'" *Id.* at 14:23:18. Given the conflicting statements, the trial court was left to determine which one was credible. The court believed Allen-Wilson's interview statement and found him guilty of robbery. Allen-Wilson now asks us to reweigh the evidence and credit his trial testimony in support of his mistake-of-fact defense. We will not reweigh evidence or determine witness credibility; that role is reserved for the fact-finder. *Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012).

## II. Sentencing

[18] Allen-Wilson also argues that, even if the State rebutted his mistake-of-fact defense, his sentence is inappropriate and should be revised pursuant to Indiana Appellate Rule 7(B). Under Indiana Appellate Rule 7(B), this Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence is inappropriate in light of the nature of the offense and the character of the offender. *Brown v. State*, 10 N.E.3d 1, 4 (Ind. 2014). The defendant has the burden of persuading this Court that his sentence is inappropriate. *Thomson v. State*, 5 N.E.3d 383, 391 (Ind. Ct. App. 2014). Level 2 felonies have a sentencing range of ten to thirty years, with an advisory sentence of seventeen-and-a-half years. Ind. Code § 35-50-2-4.5. Allen-Wilson was sentenced to the minimum term of ten years, to be served in the Department of Correction.

[19] Allen-Wilson first contends that his fully executed ten-year sentence is inappropriate when compared to Stephanie's twelve-year sentence (ten years executed) and Sean's twenty-year sentence (twelve years executed). *State v. Hegwood*, No. 32D02-1608-F3-037 (Hendricks Sup. Ct. Apr. 17, 2017); *State v. Euliss*, No. 32D05-1608-F2-011 (Hendricks Sup. Ct. Sept. 7, 2017). He asks us to compare all three sentences and revise his sentence accordingly. We decline his invitation. *See Clark v. State*, 26 N.E.3d 615, 618 (Ind. Ct. App. 2014) (stating that this Court **may** compare sentences among those convicted of the same crimes but that we are not required to do so), *trans. denied*. In any event, Allen-Wilson received a lesser sentence than Stephanie and Sean presumably because he was "the least culpable of the three." Tr. Vol. IV p. 62.

[20] Regarding the nature of the offense, Allen-Wilson did nothing to prevent the robbery from happening. At all times, Allen-Wilson was complicit in the taking of Paul's property: he did not object to Sean holding Paul at gunpoint; he did not object to Paul being handcuffed, resulting in Paul having permanent nerve damage to his hands and permanent marks on his wrists; he physically loaded Paul's possessions—ten guns and over 10,000 rounds of ammunition—into Sean's truck; and he did not object to Sean tying Paul up with the laptop cord before they left the house.

[21] As to his character, Allen-Wilson points out that he has been homeless on multiple occasions, has opened his apartment to people in need, and has no other criminal convictions. While all of this is true, Allen-Wilson neglects to mention that he was high during the robbery and willingly lied to the trial court

at his guilty-plea hearing when he claimed that Sean was not involved at all in the robbery. During the sentencing hearing, the trial court stated that it did not care why Allen-Wilson lied to the court, that Allen-Wilson needed to "stop compounding the mistakes" he was making, and that his actions were an attempt to "subvert justice." *Id.* at 63. The court then imposed the minimum sentence for a Level 2 felony and also recommended that Allen-Wilson participate in Purposeful Incarceration, noting that successful completion of the program could result in a sentence modification. Accordingly, Allen-Wilson has failed to persuade us that his minimum sentence is inappropriate.

[22]    Affirmed.

Riley, J., and Kirsch, J., concur.